UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

**ROBERT SMITH**                                                                       **PLAINTIFF**

**v.**                                    **CASE NO. 4:08-CV-1157 GTE**

**JOHNSON & JOHNSON DISABILITY
RETIREMENT INCOME BENEFIT PLAN**                           **DEFENDANT**

## MEMORANDUM OPINION AND ORDER

This ERISA case is before the Court on cross-motions for summary judgment. Plaintiff Robert Smith appeals the denial of benefits under a Long Term Disability Insurance Plan issued by his former employer, Johnson & Johnson. Plaintiff began collecting disability benefits on July 17, 1995. On November 12, 2005, after receiving benefits for over ten years, Plaintiff's benefits were terminated after Defendant concluded that he no longer met the definition of "totally disabled."

The parties dispute whether Defendant's determination to discontinue Plaintiff's disability benefits was supported by substantial evidence. For the reasons stated below, the Court concludes that the Plan's decision to terminate Plaintiff's previously awarded disability benefits was not supported by substantial evidence.

**I.    FACTS OF RECORD**

Plaintiff Robert Smith ("Smith") was previously employed by Johnson & Johnson (J&J). As part of his employment, Smith was eligible for disability benefits under the Johnson & Johnson Disability Retirement Income Benefit Plan ("the Plan"). Plaintiff quit working for J&J on January 16, 1995, due to osteoarthritis in his left leg. On July 17, 1995, Plaintiff began receiving long-term disability ("LTD") benefits under the Plan.

- 1 -

On October 21, 2003, Plaintiff completed a questionnaire at the Plan Administrator's request.  It appears that the Plan Administrator at this time was Kemper.  Plaintiff described his job duties for the past fifteen years as including packing and sorting. He also wrote that he could not remember his other duties. He stated that his job duties had required him to lift and walk.[1] He further indicated on the form that he did not graduate from high school as his formal education ended after the fifth grade.  The only income Plaintiff was receiving was $525 per month in disability payments.

Plaintiff indicated that he was in too much pain to return to work.  He stated that his medications included Vioxx and Tramadol every four hours for pain, although he noted that lack of money kept him from taking the medications daily.  He noted that he still drove, but his average driving distance was a few blocks.  For hobbies, Plaintiff listed only that t he watched television.

Asked to describe in his own words what kept him from performing his own occupation, Plaintiff wrote: "Full of arthritis. Pain in both legs.  Can't stand for long periods of time. Need surgery again.  Still in pain."  Asked to describe in his own words what kept him from engaging in any gainful employment, Plaintiff wrote: "Lack of education & skill & constant pain.  Can't walk long, can't stand long.  Knees hurt all the time."[2]

Plaintiff was required periodically to submit proof of a continuing disability for review by the Plan. During one such review on August 26, 2004, Amelia Hession, a nurse case manager,

---

[1] J&J0135.  Mr. Smith's handwriting is difficult to read.  The Court is unable to determine what some of it says.

[2] J&J0132.

- 2 -

contacted Plaintiff's treating physician, Dr. Phillip Johnson, for a "peer to peer discussion" of Plaintiff's current limitations.  Following the phone conversation, Nurse Hession indicated that Dr. Johnson had agreed with her that Plaintiff was "capable of sedentary work ability."[3]

Based on the letterhead, it appears that by this time, August of 2004, the Plan Administrator had changed from Kemper to Broadspire.[4]  Broadspire was still the Plan Administrator when Plaintiff's benefits were terminated.[5]

Based solely on this alleged agreement over the telephone, Nurse Hession asked Dr. Johnson to complete a "Right to Work Release" ("RWR").  Dr. Lipke, rather than Dr. Johnson, completed the form.  The form did not advise Dr. Lipke that Plaintiff was on total disability, but suggested that he had been on a medical leave of absence.  Dr. Lipke clearly indicated in the form that Smith could not return to work.  In response to the question of when Smith could return to work from a medical leave of absence, Dr. Lipke wrote, "unknown – reevaluate on next office visit."   Dr. Lipke further documented that at that time Plaintiff "has all restrictions and is off work for now."[6]  Dr. Lipke's signed that RWR on September 29, 2004.

The Plan then requested an independent medical review ("IMR") of Plaintiff's case from Dr. Ira Posner, an orthopedic surgeon.[7]  He completed the review on September 13, 2004.  The record indicates only that Dr. Posner was provided "Office notes" as information to review and

---

[3] J&J0122.

[4] *Id*.

[5] J&J0229.

[6] J&J0125.

[7] J&J0128.

consider in providing his opinion.[8] There is no itemization of the documents provided for review, even though the form indicates that the information reviewed or considered should be listed and any documents should be itemized for review.

Dr. Posner did not examine Plaintiff. Nor did he speak with Dr. Johnson. Instead, based solely on his review of unidentified "office notes" he concluded:

> This individual would be functional for sustained work activity at the sedentary level. He should avoid prolonged walking or standing but otherwise should have no difficulty with sustained work activity of the sedentary type. This opinion was agreed to by Dr. Johnson in a peer to peer review."[9]

Clearly, a critical component of Dr. Posner's opinion was Nurse Hession's report that Dr. Johnson agreed that Smith could perform sedentary work. It appears that Nurse Hession may have overstated Dr. Johnson's alleged agreement. Nurse Hession indicated in requesting a RWR from Dr. Johnson that he had agreed that Smith "was capable of sedentary work ability." Acknowledging that a patient is theoretically capable of sedentary work is distinct from opining that he is actually "functional for sustained work activity at the sedentary level."

Furthermore, Nurse Hession appears to have disregarded completely the opinion of Dr. Lipke, who completed the RWR that Nurse Hession sent to Dr. Johnson following their conversation. Dr. Lipke clearly indicated that Smith could not work and that it was unknown when he could return to work. This clearly undercut Dr. Johnson's agreement, in theory, that Smith might be capable of sedentary work ability. The record does not indicate whether Dr. Posner was provided with Dr. Lipke's written documentation that Smith could not work which occurred after Nurse Hession's reported telephone conversation with Dr. Johnson.

---

[8] J&J0130.

[9] J&J0130.

Finally, Dr. Posner did not make any findings to show that Smith's condition had improved or that it could be expected to improve. He noted Smith had "end stage osteoarthritic changes of his knees" and that his disease was "progressive in nature." Dr. Posner observed that any restrictions would be permanent.

Following Dr. Posner's review, the Plan requested that Plaintiff undergo a Functional Capacity Evaluation ("FCE"). The FCE was performed on December 3, 2004, by Dr. Michael DuPriest, a chiropractor and physical therapist certified as an orthopedic specialist. Dr. DuPreist found that Plaintiff "gave a reliable effort" on the testing. Dr. DuPriest wrote that Plaintiff had been diagnosed with end stage osteoarthritis of the knees and that he reported pain and palpable crepitus in both knees. Plaintiff also reported experiencing pain in walking, standing, squatting, and stair climbing. Plaintiff further complained of low back pain, wrist pain, and left shoulder pain during the testing. Plaintiff's only reported hobby at that time was watching television.

Dr. DuPriest concluded that Plaintiff could sit and reach with his right hand on a constant basis; that he could reach with his left hand, and use his hands and fingers on a frequent basis; and that he could climb stairs, stand, walk, balance, stoop, carry up to ten pounds, push up to 100 pounds and pull up to 100 pounds on an occasional basis.[10] Dr. DuPriest concluded that Plaintiff was capable of performing sedentary work with no lifting. He noted that he made this statement "strictly from the standpoint of impairment."[11]

During the FCE, Plaintiff informed Dr. DuPriest that he was scheduled to undergo total knee replacement in January 2005. The Plan wrote to Smith on January 26, 2005, and requested an updated APS and Physical Abilities Form following Plaintiff's surgery.

---

[10] J&J0140.

[11] J&J0141.

On February 21, 2005, Dr. Johnson completed the requested APS. Dr. Johnson indicated that Plaintiff had total knee replacement surgery on February 11, 2005. Dr. Johnson rated Plaintiff's progress as "unchanged," his prognosis as "fair." Asked to indicate how soon "fundamental changes in the patient's medical condition" could be expected, Dr. Johnson checked "more than 6 months" – the longest option provided in the 4 boxes provided. . Dr. Johnson indicated that Plaintiff was "off work" with "all restrictions" and "all limitations." He ranked his level of physical impairment as Class 5 - "severe limitation of functional capacity/incapable of sedentary work."[12] Dr. Johnson further indicated that Plaintiff was <u>not</u> a candidate for vocational rehabilitation.

The APS contained one page that asked Dr. Johnson to provide an evaluation of Plaintiff's physical abilities. Dr. Johnson marked through this section of the form and indicated it was not applicable as Plaintiff was not working.[13]

On June 6, 2005, the Plan sent a follow up letter to Plaintiff, requesting that he complete another APS and Physical Abilities Form. Dr. Phillip Johnson completed the requested form on June 16, 2005.[14] Dr. Johnson indicated that Plaintiff had "marked degenerative changes" of the knee, noted that his prognosis was "fair" and that he was not expected to achieve maximum medical improvement for another six months. Dr. Johnson did not rank Plaintiff's level of impairment, and he did not perform an evaluation of Plaintiff's physical abilities. It appears that Dr. Johnson believed it unnecessary to answer such questions because the Plaintiff was "off

---

[12] J&J0173-174.

[13] J&J0175.

[14] J&J0187-189.

- 6 -

work" which he wrote when he marked through the level of impairment section of the form and on an entire page entitled "evaluation of physical abilities."

On June 24, 2005, Plaintiff completed a questionnaire at the Plan's request. He indicated that he was taking Tramadol every four hours for pain. He indicated that he was able to cook and drive, although he only drove a few miles daily. Plaintiff answered that he was able to fish and visit friends for fun. He further indicated that he did not go for walks and that he had trouble sleeping.

The Plan requested another FCE of Plaintiff which was administered on August 19, 2005, by Frank Reaper, a physical therapist. Mr. Reaper was asked to determine Plaintiff's ability to perform the duties of any occupation. He found that Plaintiff put forth a reliable and consistent effort in the testing. Mr. Reaper concluded: "If Mr. Smith should return to work, he should seek employment that requires minimal walking, stair climbing and a low level of balance."[15]  Mr. Reaper noted that Plaintiff should be allowed to change positions frequently from sitting to standing. He also warned that any lifting, even of a light object from the floor, could lead to serious injury to this patient secondary to his poor body mechanics. Finally, Mr. Reaper noted that he had instructed Plaintiff to see his primary care physician regarding his hypertension.

In a letter dated September 13, 2005, the Plan Administrator notified Plaintiff that it was terminating his benefits, effective November 12, 2005, because it had determined that he no longer met the definition of totally disabled under the Plan. For cause, the Plan Administrator advised that Mr. Reaper's FCE had concluded that he was capable of working a sedentary job at 8 hours a day. It further noted that his treating physician's progress notes did not indicate any

---

[15] J&J0201.

functional disabilities present that would render Plaintiff "'totally disabled from any occupation.'"[16]

The letter further advised Plaintiff of his right to be examined at his own expense by a licensed medical doctor and to report the findings to the Plan. Further, the letter quoted the Plan provision providing that if Plaintiff's doctor disagreed with the Plan's determination, a third doctor would be jointly appointed to evaluate Plaintiff and that decision as to disability would be binding on all parties.[17]

On September 29, 2005, Plaintiff, through attorney James Stanley, submitted a letter stating that he contended that Plaintiff still met the requirements for total disability. The letter indicated that additional evidence would be provided. The letter also noted that Plaintiff had been granted Social Security Disability and urged the Plan to take such findings into consideration.

On November 14, 2005, Plaintiff, through counsel, submitted a letter from Dr. Philip Johnson, dated November 3, 2005. Dr. Johnson's letter reads:

Dear Mr. Stanley:

Mr. Robert Smith has been a patient in our clinic since September of 1987. He has recently (January of 2005) had a total knee arthroplasty on the right side. He has had a high tibial osteotomy for severe osteoarthritis of the left knee and faces a total knee arthroplasty on the opposite left knee. He has multiple joint arthritis, involving the right wrist, where he has persistent swelling. He also has deformity of the right foot with secondary arthritis as the result of an old gunshot wound.

Range of motion in his right knee is restricted to approximately 90 degrees at 10 months postoperative, which is less than I had anticipated.

---

[16] J&J0227.

[17] J&J0227-0228.

> I feel that his Social Security Disability is quite justified. I do not feel that he is a candidate for gainful employment. I am not a vocational counselor. I have not seen his physical assessment evaluation, but it is my opinion that the patient is not employable with the physical maladies and handicaps he possesses.[18]

After receiving this letter, the Plan did nothing further.

Plaintiff filed this action on August 14, 2008.

## II.   STANDARD OF REVIEW

District courts review an ERISA plan administrator's decision to terminate benefits *de novo*, unless the benefits plan vests the administrator with the discretionary authority to determine benefits eligibility or to interpret the terms of the plan. *Firestone Tire and Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 957-58 (1989). Where the plan administrator has such discretionary powers, courts review a denial-of-benefits claim with a deferential eye, overturning the administrator's decision only if it was "arbitrary and capricious." *See*, *e.g.*, *Lickteig v. Business Men's Assur. Co. of America*, 61 F.3d 579, 583 (8th Cir. 1995).

The parties appear to concede that the plan language is sufficient to grant to the fiduciary charged with administration of the Plan discretionary authority to interpret the Plan and to determine eligibility for benefits. *See* J&J's Plan, Exhibit 1 to Def.'s brief at pp. 33-34. Accordingly, the Court conducts its review under the more deferential abuse of discretion standard.

"Review of an administrator's decision under an abuse of discretion standard, though deferential, is not tantamount to rubber-stamping the result." *Torres v. UNUM Life Ins. Co. of America*, 405 F.3d 670, 680 (8th Cir. 2005). "On the contrary, [the Court] review[s] the decision

---

[18] J&J236.

for reasonableness, which requires that it be supported by substantial evidence that is assessed by its quantity and quality." Id.

"The proper inquiry under the deferential standard is whether 'the plan administrator's decision was reasonable; i.e. supported by substantial evidence.'" *Cash v. Wal-Mart Group Health Plan*, 107 F.3d 637, 641 (8th Cir. 1997). Substantial evidence is "more than a mere scintilla." *Fletcher-Merrit v. NorAm Energy Corp*., 250 F.3d 1174, 1179 (8th Cir. 2001). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. A fiduciary's decision is reasonable if a reasonable person could have reached a similar decision, given the evidence in the record, not whether the reasonable person would have reached that decision. *Cash v. Wal-Mart Group Health Plan*, 107 F.3d at 641 (8th Cir. 1997). In determinating whether a decision is reasonable, the decision is evaluated to determine whether it is "supported by substantial evidence that is assessed by its quantity and quality." *Torres v. UNUM Life Insurance Co. of America,* 405 F.3d 670, 680 (8th Cir. 2005).

Applying such standard, the Court concludes that substantial evidence is lacking in the record to justify the Plan's decision to terminate Smith's disability benefits.

## III.    DISCUSSION

In 1995, the Plan Administrator determined that Plaintiff was totally and permanently disabled and unable to perform his occupation or any other occupation. Under the terms of the Plan, a licensed medical doctor appointed by J&J was required to state whether Plaintiff was "Totally and Permanently Disabled."

The Plan defines "Total and Permanently Disabled" to mean:

the Member's inability to work, due to sickness or injury, both in the Member's occupation, and in any other occupation with no expectation of ever returning to work. . . . Effective January 1, 2002, "Total and Permanent Disability" means the Member's inability to work, due to sickness or injury, both in the Member's

- 10 -

occupation, and in any other occupation with no expectation of returning to work within eighteen months. The medical certification process used to determine whether an Employee is Totally and Permanently Disabled that is specified in Section 4.04 shall continue to apply.[19]

Thus, it may be assumed that J&J's own physician concluded in 1995 that Plaintiff was unable to work in <u>any occupation</u>. He also must have concluded at that time that there was no expectation that Plaintiff would ever return to work.

A logical question in this circumstance is to ask what happened between 1995 and 2005 to improve Smith's disability to permit him work. Such common sense inquiry has been incorporated into the law.

The Eighth Circuit has instructed that "in determining whether an insurer has properly terminated benefits that it initially undertook to pay out, it is important to focus on the events that occurred between the conclusion that benefits were owing and the decision to terminate them." *McOsker v. Paul Revere Life Ins. Co.*, 279 F.3d 586, 590 (8th Cir. 2002) (omitting citation). The *McOsker* court further stresses that it was "not suggesting that paying benefits operates forever as an estoppel so that an insurer can never change its mind; but unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weight against the propriety of an insurer's decision to discontinue those payments." *Id.*, at 589.

In the Court's view, both parties misconstrue to some extent the import of the *McOsker* decision. Defendant argues correctly that the Plaintiff is wrong when he suggests that there is a presumption of disability that the Plan must overcome in order to terminate benefits. But, the Plan understates *McOsker* holding. Its argument suggests that it was free at any time to

---

[19] Plan at p. 6, ¶ 1.11.

- 11 -

reevaluate Plaintiff's disability and ability to perform "any occupation" anew, just as if Plaintiff had never been found to be disabled and without any reference whatsoever to whether there had been a change of circumstance that justified the termination of benefits. This is contrary to *McOsker*. See also *Hairston v. Loctite Corp.*, 2006 WL 568326 (E.D. Ark. 2006 March 7, 2006) (discussing *McOsker*).

There is nothing in this record regarding the initial determination of disability. The Administrative Record submitted by the Plan is a scant 85 pages. Of course, this represents only those portions found to be relevant by the Defendant Plan. But, there is nothing in this record to indicate that the Plan Administrator gave any consideration to the initial decision of total disability made by a J&J appointed physician, which necessarily included a finding that there was no expectation that Smith would ever return to work in any occupation. Nor did the Plan Administrator identify any significant change in Plaintiff's physical condition or ability to work.

Instead, Nurse Hession started the process to terminate Plaintiff's benefits in August 2004, by getting Plaintiff's treating physician Dr. Johnson during an alleged "peer to peer" review by phone, to agree with her that Plaintiff was "capable of sedentary work ability." She then leveraged that opinion to get Dr. Posner in a medical review to agree with Dr. Johnson's alleged opinion, and used that as a justification to start the ball rolling to challenge Plaintiff's disability.

The Plan Administrator simply ignored Dr. Johnson's opinion on February 21, 2005, that Plaintiff continued to have all restrictions and all limitations and that he had "severe limitations of functional capacity" that made him "incapable of sedentary work." Nor did the Plan consider the fact that no physician ever conducted an examination of Plaintiff after he was declared disabled from any occupation and found him capable of performing sedentary work.

That the Defendant terminated Plaintiff's benefits without a medical examination is contrary to the terms of the Plan itself. The Plan states that a disabled Member may be asked to "submit proof of continuing disability and to submit to a medical examination at the Employer's expense at any reasonable time, but not more than once every 6 months. Refusal to provide proof of disability or to submit to a medical examination will cause the Disability Income to terminate as of the date such request is made."[20]

Plaintiff never refused to submit to a medical examination. Nor did he refuse to provide proof of disability. Defendant alleges that the proof of disability completed by Dr. Johnson on June 6, 2005, was inadequate because Dr. Johnson failed to rank Plaintiff's level of impairment and evaluate Plaintiff's physical abilities. But Dr. Johnson obviously believed that it was unnecessary to do so because Plaintiff was "off work." Further, Dr. Johnson did not contradict in any way his February 11, 2005, assessment in which he found Plaintiff to be "incapable of sedentary work." Dr. Johnson's inaptitude in completing the Plan's extensive form on one occasion did not justify or support the finding that Plaintiff had ceased to be disabled.

In the absence of a disabled Member's refusal to provide proof of disability, the Plan provides that disability benefits may be discontinued only on the basis of medical examination.[21] But even if a medical examination shows that the covered employee is not longer "Totally and Permanently Disabled," the Plan gives the covered employee certain rights before benefits should be terminated. The Plan states:

> (e)   If, on the basis of medical examination, it is found that an Employee is not, or is no longer, Totally and Permanently Disabled within the meaning

---

[20] Plan at ¶ (d), pp. 18-19.

[21] Plan at pp. 18-19.

- 13 -

> of this Plan, and the Employee disagrees with the doctor's findings, the Member may invoke the following procedures:
> (i) the Member may, at his or her own expense, be examined by a licensed medical doctor and report the findings to the Employer.
> (ii) if both doctors agree that the Member is not disabled within the meaning of this Plan, then no Disability Income will be paid.
> (iii) if the doctors do not agree, they will jointly appoint a third doctor who is admitted to practice in a recognized hospital. The third doctor's decision as to disability is binding on all parties. The Employer and the Member will jointly pay the costs of the third doctor.[22]

The Plan Administrator disregarded the Plan's contractual requirements for termination of benefits when it terminated Plaintiff's benefits without obtaining a medical examination that indicated that Plaintiff was no longer disabled. Instead, it relied solely on Mr. Reaper's Functional Capacity Examination ("FCE") conducted on August 19, 2005, and on Dr. Johnson's allegedly insufficient progress notes. Mr. Reaper's FCE is not sufficient alone to support the conclusion that Plaintiff was capable of returning to the work force. Rather, it only supports the conclusion that <u>assuming</u> Plaintiff could return to work, he would be limited to sedentary work with minimal walking, no stair climbing, and minimal balance requirements.

The evidence indicates that Plaintiff's physical condition had not improved during the ten years he was off work, but rather that it had deteriorated further. All the medical reports in the administrative record submitted to the Court indicate that Plaintiff suffered from a progressive disease. Even Dr. Posner agreed that any limitations would be permanent.

And the Plan Administrator simply ignored Dr. Johnson's letter of November 3, 2005, in which he opined that Plaintiff was not "a candidate for gainful employment" and his medical

---

[22] Plan at p. 19.

opinion that "the patient is not employable with the physical maladies and handicaps he possesses."[23]

So, in this case the only physicians to have examined Smith (Dr. Johnson and, perhaps Dr. Lipke) were treating physicians. All opined that he was not able to work. No medical examination ever resulted in the conclusion that Plaintiff was able to return to full time employment. Rather, all the medical records and opinions of Plaintiff's treating physicians reflect no substantial change in Smith's condition. The Court recognizes that ERISA requires no special deference to treating physicians. *McGee v. Reliance Standard Life Ins. Co.*, 360 F.3d 921, 925 (8th Cir. 2004). Here, however, there is no other physician evidence that the Plan could have relied upon.

The Plan Administrator did not state in her termination letter that the Plan relied on Dr. Posner's record review in denying benefits, but that is the only physician evidence contained in the record other than Plaintiff's treating physicians. Even absent the Plan language requiring "a medical examination" to terminate disability benefits previously awarded, Dr. Posner's record review is not sufficient to justify disregarding the opinion of Plaintiff's treating physician.

Substantial evidence is lacking to justify Dr. Posner's conclusions. He relies principally on an alleged hearsay opinion of Dr. Johnson which appears to have been misrepresented,. Further, he either disregarded or was not provided with Dr. Johnson's prior (and subsequent) assessments that Smith was incapable of sedentary work. Because Dr. Posner's opinion lacks substantial support in the record, it would not be a sufficient basis for the Plan to terminate Smith's benefits. See *McDonald v. Western-Southern Life Ins. Co.*, 347 F.3d 161, 169-71 (6th Cir. 2003) (reviewing physician's opinion found not to be substantial evidence where the opinion

---

[23] J&J0236.

contradicted that of treating physicians' opinions and both the claimant's diagnosis and condition were unchanged from the time benefits were first awarded).

The Plan's decision to terminate benefits is also flawed because it made no effort to determine whether, even assuming Plaintiff was physically capable of performing sedentary work, he possessed the skills necessary to perform such work. There is no indication in the record that he has any skills or experience that would permit him to perform the job tasks required by any sedentary occupation. In fact, all evidence is to the contrary.

Plaintiff Smith has a fifth grade education.[24] There is nothing in the record to dispute Plaintiff's own assessment that he lacked the education and skills to work in any occupation. There is no evidence that Plaintiff ever worked in a sedentary job. In 1995, the Plan Administrator determined that there was no job that Plaintiff could perform. Further, the fact that the Social Security Administration found Plaintiff to be disabled provides additional support that there are no jobs that he is capable of performing.

Defendant argues that it was not required to conduct a vocational review because there was substantial evidence in the record that Plaintiff was capable of performing physical activities. The Court disagrees. While it is true that a plan administrator is not required in every case to obtain a vocational assessment, under the facts and circumstances of this particular case, it was improper to cease paying benefits without first obtaining a vocational expert's opinion or, at a minimum, some objective support for the assumption that a sedentary job existed that Smith was qualified by education, training or experience to perform. See *Gunderson v. W.R. Grace & Co. Long Term Disability*, 874 F.2d 496, 499 (8th Cir. 1989) (finding that plan administrator acted arbitrarily and capriciously in concluding that claimant had sufficient skills to perform sedentary

---

[24] J&J 0134.

- 16 -

work without retraining and terminating claimant's benefits without obtaining vocational expert's opinion);  See also *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 476 (7th Cir. 1998) (while plan administrator is not obligated to perform a full blown vocational evaluation, it has a duty to determine the types of skills possessed by the claimant and whether such skills would enable her to engage in another occupation).

## IV. CONCLUSION

There is no substantial evidence that the physical ailments that caused Smith to be declared disabled in 1995 had improved at all, much less significantly, in 2005.  There is no substantial evidence that Smith had suddenly acquired the ability to perform the job duties of any occupation in 2005 even though he had been found to lack the ability to do so in 1995.  The Plan's decision to terminate Plaintiff's benefits was therefore an abuse of discretion.

IT IS THEREFORE ORDERED THAT Plaintiff's Motion for Summary Judgment (docket entry # 22) be, and it is hereby, GRANTED, and

IT IS FURTHER ORDERED THAT Defendant's Motion for Summary Judgment (docket entry # 24) be, and it is hereby, DENIED.  Defendant is ordered to reinstate Plaintiff's benefits and pay him back benefits plus interest from November 12, 2005, forward.

IT IS SO ORDERED this  31st  day of March, 2010.

                                     _/s/Garnett Thomas Eisele_____
                                     UNITED STATES DISTRICT JUDGE